**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**John Michael DONNER et al.,**
**Defendants-Appellants.**

**Nos. 75–1361–1363.**

United States Court of Appeals,
Seventh Circuit.

Argued June 11, 1975.

Decided Dec. 24, 1975.

As Amended Feb. 6, 1976.

Thomas P. Sullivan, Peter A. Flynn, Chicago, Ill., David J. Colman, Bloomington, Ind., Lawrence J. Suffredin, Jr., Chicago, Ill., for defendants-appellants.

John E. Hirschman, U. S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before CLARK, Associate Justice,\* STEVENS, Circuit Justice,\*\* and GRANT,\*\*\* Senior District Judge.

CLARK, Associate Justice.

These appeals, seeking reductions in sentence under Rule 35 of the Federal Rules of Criminal Procedure, involve three of the eight defendants convicted of vandalizing the Marion County, Indiana, headquarters of the Selective Service System.

At those offices on October 31, 1969, some 135,000 registration cards were scattered, file drawers were pulled open, their contents strewn about, and numerous documents were torn and mutilated. Some classification records kept in large permanent ledgers were torn apart completely, while others were fanned open and sprayed with black paint. All of this destruction amounted to approximately $30,000 in damage that required six months to repair. Two weeks after the incident, the eight defendants held a press conference in Washington, D. C., to reveal themselves as the parties responsible for the vandalism.

The eight held a second press conference on November 20, 1969, in Indianapolis, Indiana. Some forty persons gathered for this second conference, half of whom were from the news media. Appellant Paul J. Mack acted, with the acquiesence of the others, as presiding officer. He introduced each of the eight by name and home address and identified them collectively as "The Beaver 55."

After completing the introductions, Mack read a written statement which he said "we have prepared" and which related, inter alia:

> We claim responsibility for the actions against the Selective Service Offices in Indianapolis, Indiana, on October 31. . . . We have done this because we are not blinded by the lies that corporations attempt to pawn off on us. \* \* \* We have done this because we will no longer tolerate this madness. We will no longer tolerate any form of conscription to kill. We will no longer tolerate the Christians' 'just war', the liberals' cries for 'honorable peace.' We put our hope in life,

\* Associate Justice Tom C. Clark, United States Supreme Court, Retired, is sitting by designation.

\*\* Mr. Justice Stevens participated initially as Circuit Judge; on and after December 19, 1975, he participated as Circuit Justice.

\*\*\* Senior District Judge Robert A. Grant of the Northern District of Indiana is sitting by designation.

and our lives in hope and will continue to actively resist any system which obstructs those goals.

Other statements made by the group included:

> We are perfectly prepared to pay, or serve our time in jail, because we expect that that is what will happen to us. * * * [I]t is not a matter or guilt or innocence, it's a matter of . . . responsibility. We claim that we are responsible for our actions.
>
> *    *    *    *    *    *
>
> Involvement by American people who are concerned has to go further than marching. . . . [W]e have found that definitely more extreme measures are going to have to be taken and that is why we have taken this action.

Subsequently, the eight were indicted,[1] tried before a jury, and found guilty on all four counts of the indictment. On appeal, the convictions on three counts were affirmed, but the convictions on one count were reversed because it could not be said that the jury did not convict on a combination of words protected by the First Amendment. These three appellants had prior to appeal each received concurrent sentences of four years on each of three counts and a fine of $5,000 on a fourth.

Following the reversal of the convictions on one count, five of the defendants, including these three appellants, made applications for reduction of sentence under Rule 35. After a two-day hearing, the trial judge reduced the combined sentence of each appellant here by one year, leaving each with a term of three years. Two of the other defendants, however, were granted probation, one because he was the sole support of his wife and two children, and the other because she was induced by her husband to join in the acts of vandalism.

Appellants challenge their sentence to prison. We take up the claims of error of each appellant, seriatim.

1. *Paul Joseph Mack* :

▆▆ Among the points raised by Mack is one which stresses that, at the time of the commission of the offense charged, he was only eighteen years of age. His sentencing would, therefore, come under the provisions of the Youth Corrections Act, 18 U.S.C. § 5005 *et seq.* Section 5010(d) of the Act requires that the sentencing court "find that the youth offender will not benefit from treatment under subsection (b) or (c)" before the court can sentence under any other penalty provision. In *Dorszynski v. United States,* 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974), the Supreme Court held that an express finding under § 5010(d) was necessary "to insure that the sentencing judge exercised his discretion in choosing not to commit a youth offender to treatment under the Act." Id. at 443, 94 S.Ct. at 3052. Since the required finding was not entered "on the record," we, therefore, must vacate appellant's sentence and remand his case to the district court for resentencing.

2. *John Michael Donner* :

▆▆ At the time of his conviction, Donner was 22 years of age and, therefore, not within the commands of *Dorszynski v. United States, supra.* He previously pleaded guilty to a state charge in Michigan arising out of the destruction of records of Dow Chemical Company, an act that was virtually contemporaneous with the offense charged here. Following his conviction in this case, he served his term for the Dow Chemical vandalism, was paroled, and returned for a period to live with his parents. There-

---

1. The indictment had four counts: Count I is a conspiracy charge, under 18 U.S.C. § 371, to commit the acts alleged in the subsequent counts; Count II alleged depredations against property of the United States in violation of 18 U.S.C. § 1361; Count III charged mutilation of government documents under 18 U.S.C. § 2071 and Count IV, which was stricken on appeal, alleged unlawful interference with the Selective Service System in violation of 50 Appendix U.S.C. § 462(a).

after, he taught school in northern California, worked for a printer in Oakland, and ultimately became involved in the Divine Light Mission (DLM). In early 1973, he joined an "ashram" of that group, began a quasi-monastic life, and took a one-year vow of poverty, chastity, and obedience as a member of the DLM. Later, in April 1974, he made those vows permanent. Since July 1974, he has been the National Executive Director of the DLM.[2]

Donner claims to have undergone a strong and thorough change since his conviction as a result of his association with DLM. He expresses regret for the acts which led to his convictions in both Indiana and Michigan. At his Rule 35 hearing, he confessed that the acts for which he was convicted were wrong, unjustified, and neither would nor ought to be repeated. Other testimony at the hearing supported Donner's testimony and several witnesses characterized him as a person who had undergone personal rehabilitation and was now making a positive and constructive contribution to society.

Donner lists several grounds in support of his position that the trial judge clearly abused his discretion in imposing the sentence: (1) The judge "flatly refused" to state any reasons for his denial of probation. It is well established, however, that generally a trial judge is under no obligation to give reasons for his sentencing decision, although it might well be the better practice for him to do so. First, the Federal Rules of Criminal Procedure do not require the statement of any reasons; and, further, it appears significant to us that while the new rules do require "reasons stated on the record" in connection with the refusal of the judge to order a presentence report

under Rule 32(c)(1), a similar requirement is not present as to sentencing. Cf. *United States V. Rosciano*, 499 F.2d 166 (7th Cir. 1974). Also see *McGee v. United States*, 462 F.2d 243, 247 (2d Cir. 1972). Moreover, it must be remembered that this is an appeal from the refusal to grant relief under Rule 35 rather than a direct appeal from the original sentence. On the direct appeal no relief was granted on the sentences there imposed, and a Rule 35 application would, therefore, have to carry a heavier burden of proof as well as be tested by a narrower standard of review.

(2) The remainder of Donner's challenges assert that the trial judge clearly abused his discretion in refusing him probation in that he ignored the uncontradicted evidence, failed to apply standards set out in 18 U.S.C. § 3651, and failed to give Donner the individualized treatment required on Rule 35 applications.

At the outset it is well to recall what this court recently said in *Cardi v. United States*, 519 F.2d 309, decided July 10, 1975:

> A district judge has wide discretion, within the statutory limits, in imposing sentence and the exercise of that discretion will not be disturbed on appeal except on a plain showing of abuse. At 311.

The record shows that the trial judge granted a hearing on the Rule 35 application and heard the evidence offered by the appellants for two days which included the testimony of the witnesses, the pre-sentence report of 1970 and the exhibits attached to the pre-sentence report. The court emphasized that he would give separate consideration to the claims of each of the appellants and the fact that he granted probation to two of

---

2. Divine Light Mission is recognized as a church by the Internal Revenue Service under 26 U.S.C. § 170(b)(1)(A)(i). It claims 17,000 regular active followers in the United States, 27,000 less-than-regular ones and approximately 50,000 "followers" in the United States in its meditation practices. DLM has been recognized twice by the Selective Service System as an appropriate "alternative service employer," once in the context of the standard conscientious objector provisions of 50 U.S.C. App. § 456(j) and once in the context of the Clemency Proclamation No. 4313, 39 F.R. § 3293. DLM, among other activities conducts a broad range of social service programs with an annual budget of $250,000 a month in some 184 cities in the U. S.

the five attests to this fact. He also took an active part in questioning the witnesses and entered an order reducing the sentence of each appellant by one year.

It is true that the trial judge did not give any reasons for his actions, but it seems clear that even though Donner's behavior subsequent to his convictions had materially changed the court may have concluded that some punishment was necessary in light of the gravity of the offense and entered a three-year sentence as to each appellant as a consequence.

We cannot see how this hearing and subsequent action indicate a failure to give each appellant individualized attention, as the court promised. Nor can it be said that the proper standards were not applied. As we read the record, the judge concluded that "the ends of justice and the best interests of the public as well as the defendant would be served" by not granting probation to any of the appellants. Donner admits that the offense was a most serious one and that his record was blemished by his guilty plea in the Dow Chemical Company case which was somewhat similar to the Indianapolis one. Commendably, Donner now admits his error and regrets his action. In addition, he has undergone personal rehabilitation and appears to be making a positive and constructive service to society through the Divine Light Mission. We fully recognize and commend him in this regard. Carlyle tells us that of all acts of man, repentance of one's past deeds and the shaping of future efforts to offset evil by positive good is most divine. But even the truest repentance and most positive efforts to offset prior evil do not carry forgiveness of punishment. Its want emboldens lawlessness and entices others to join in lawbreaking. Crime must have its punishment lest it encourage licentiousness. As we view it, the seriousness of the offense here is inconsistent with a sanction other than imprisonment. ABA Standard Relating to Sentencing Alternatives and Procedure, 1968 draft, Sec-

tion 2.2, Comment a. The granting of probation might well have "unduly depreciated the seriousness of the offense" committed. ABA Standards Relating to Probation, 1970 draft, Section 1.3(a).

Donner's offense is not—as he continually indicates—that of a draft violator. He participated in the vandalizing of the Indiana Headquarters of the Selective Service System of the United States Government, completely destroying 1–A and 1–A delinquent draft files and ledger books in 44 local boards in the Indianapolis Metropolitan Area. In the context of condemning the Federal Government, particularly as it was manifested in the Selective Service System, Donner and his seven comrades, calling themselves "the Beaver 55", exultantly proclaimed in their press conference, among other things:

> The draft files that were destroyed in Indianapolis, no person can be legally inducted from the metropolitan area of Indianapolis until all of the files are restored in their exact order, which is going to take them a long, long time; especially because some of these files are missing and I think that speaks, that also, not only to the fact that we can be effective through this kind of disruption. . . ."

Thus the offense here is an insolent challenge to the integrity of the processes of our government itself—the warp and woof of any free society. To let such an offense go unpunished would be a direct affront to the governmental system. We cannot say in the light of these circumstances that the refusal to grant probation was an abuse of discretion. It may be that we might not have imposed the three-year penalty, but certainly some punishment was in order and the imposition of it cannot be classified as clear abuse. If the punishment given be thought too severe, the appropriate place for its correction is before the parole board or through executive action as a matter of clemency.

3. *Jane Anne Kennedy*:

■■ Ms. Kennedy was born on August 29, 1925, and at the time of the

 

offense here was 44 years of age. She has a nursing certificate from St. Francis Hospital of Nursing, Trenton, N. J. (1946); a Bachelor of Science in Nursing from the University of Pennsylvania (1954) and a Masters in Education from the latter in 1958. Ms. Kennedy is a highly trained health professional, of the highest intelligence and morality. She is represented as being dedicated to the serving of others, and her work at Woodlawn Child Health Center has brought only the highest praise not only in quality but in irreplaceability.

She bases her claim for reduction in sentence largely on a change in her personal circumstances during the years since her original sentence. One of the federal probation officers recommended in a pre-sentence report dated June 18, 1970, that no period of imprisonment be imposed upon her. At the Rule 35 hearing, Ms. Kennedy admitted that she had done the acts charged in the indictment. Unlike her co-appellant Donner, however, she expressed no repentance. The comment that we have made as to Donner applies equally, if not more so, to her.

We understand that Ms. Kennedy also performed most laudable service to Woodlawn and other organizations, and we commend her for this. But she was a highly educated, mature adult at the time that she joined her young co-defendants in the vandalism of the government papers and offices. She committed a most serious offense and to permit her to go free of punishment would not only be a miscarriage of justice, but would be very detrimental to the interests of the public. In the Indianapolis press conference in 1969 Ms. Kennedy's group represented: "We are perfectly prepared to pay, or serve our time in jail, because we suspect that that is what will happen to us." After much travail, that time has come. We have faith that Ms. Kennedy can and will face it with the same cour-

age and integrity that her friends have ascribed to her.[3]

The judgment of the District Court is affirmed save for Paul Joseph Mack whose case is reversed and remanded for re-sentencing.

It is so ordered.

---

**3.** Other errors Ms. Kennedy claims include a disparity in sentencing. But this has long been held not to constitute an abuse of discretion. *United States v. Amick*, 439 F.2d 351, 371 (7th Cir. 1971). Other points appear to be frivolous and will not be discussed.