UNITED STATES of America

v.

Edward LEMON, Appellant.

No. 82–2327.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 28, 1983.

Decided Nov. 29, 1983.

As Amended Dec. 5, 1983.

Charles J. Ogletree, Washington, D.C., with whom Randy Hertz, A. Franklin Burgess, Jr. and James W. Klein, Washington, D.C., were on brief, for appellant.

Natalia M. Combs, Washington, D.C., a member of the Bar of the District of Columbia Court of Appeals pro hac vice by special leave of Court, with whom Stanley S. Harris, U.S. Atty., Michael W. Farrell and Doug J. Behr, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before WALD and EDWARDS, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WALD.

Concurring opinion filed by Senior Circuit Judge McGOWAN.

1. Brief for Appellee [hereinafter Government Brief] App. C at 35.

2. United States v. Lemon, No. 82–234, Transcript of Pretrial Hearing, September 20, 1982, at 6.

WALD, Circuit Judge:

Edward Lemon pleaded guilty to interstate transportation of falsely made, forged and altered securities in violation of 18 U.S.C. § 2314. He appeals from the district court's sentence of 16 months to four years imprisonment. Lemon claims that the sentencing judge improperly relied on the government's inaccurate and unreliable representations about his alleged membership in a group known as the Black Hebrews, in violation of the due process clause of the fifth amendment and the first amendment guarantee of freedom of association. Because we find that the sentencing judge appears to have placed considerable weight on information of insufficient reliability to satisfy due process, and to have considered certain factors in a manner impermissible under the first amendment, we vacate the sentence and remand to the district court for resentencing.

## I. BACKGROUND

Lemon was charged in an indictment on August 5, 1982, with two counts of interstate transportation of a stolen security in violation of 18 U.S.C. § 2314. In opposition to the defendant's motion for more lenient conditions of pretrial release, the prosecution filed a memorandum alleging that the defendant was a member of the Black Hebrews and that the defendant's association with this sect militated against release on bond because members of the group had a substantial history of fugitivity.[1] At a hearing on that motion, the prosecutor described the Black Hebrews as follows:

The sect purports to be a religious organization or a quasi-religious organization, the belief being that its members are descendents . . . from one of the original tribes of Israel, and there is a community living in Israel at this moment.[2]

The defendant denied membership in the group and objected to the prosecution's attempt to establish "guilt by association."[3]

3. Id. at 3.

The court denied the defendant's pretrial release motion on September 20, 1982. On September 29, 1982, Lemon entered a guilty plea to one of two counts in the indictment. In pleading guilty, Lemon admitted knowingly depositing in his bank account on December 23, 1981, a forged check in the amount of $5,000 from the Perseco Company.[4] In exchange for Lemon's guilty plea, the government dropped the remaining count, which involved a similar transaction with a check from the "Double J" Welding Company.[5] The court set a sentencing date of October 28, 1982.

A. *The Government's Memorandum on Sentencing*

In its memorandum on sentencing, the prosecution renewed its charges that Lemon was a member of the Black Hebrew sect and that his crime was part of a pattern of crimes committed for the benefit of the Black Hebrew community.[6] The prosecution argued that, although it was his first offense, the defendant should be given a substantial sentence because it would deter him and others involved in the group from such illegal activity, and because the defendant had failed to respond to the prosecution's request that he cooperate in its investigation of illegal activity among the Black Hebrews.[7]

In support of its allegations that Lemon was a member of the Black Hebrews and committed his offense for the benefit of the group, the government referred back to its memorandum on the bond review motion, which stated:

The defendant, at the time of his arrest was in the company of Bruce Green and Bruce Stewart both of whom have been identified through sources as members of the Black Hebrews. Green was wanted, at the time of the defendant's arrest, for a check charge in Alexandria, Virginia. Stewart is alleged to be the boyfriend of Warrena Bostick who has been identified

as a Black Hebrew, and who is wanted for a burglary in the District of Columbia in which a quantity of blank airline tickets were stolen.

The car in which the defendant was riding in at the time of his arrest was registered to Beverly Caro another suspected Black Hebrew. Ms. Caro has been observed by members of law enforcement at a meeting house frequented by Black Hebrews and a convention of Black Hebrews.

The checks the defendant is alleged to have deposited in his account are the same as the checks allegedly used in a similar scheme by Angela Kegler. Kegler, at the time of her arrest, was attending a meeting of the Women's Auxiliary of the Kingdom of God (the Black Hebrews) and she was dressed in the garb of the sect.

Terry Warr has also been accused of passing one of the stolen checks from "Double J" Welding Company. Warr has been identified as a member of the Black Hebrew sect.

The defendant used the address 4455 G Street, S.E., as his address when arrested in Ohio. The address on G Street has been identified as a clandestine meeting house for members of the Black Hebrews sect and numbers of known members of the sect have been observed frequenting that location in the past.[8]

Counsel for the government made additional claims in its sentencing allocution:

a) Myrtle Washington, a twice convicted felon and a member of the cult has been in court monitoring the progress of the defendant's case;

b) Terry Warr has been arrested for a scheme similar to the defendant's involving a Double J Welding check. Warr is a

---

**4.** United States v. Lemon, No. 82–234, Transcript of Hearing, September 29, 1982, at 8.

**5.** *See id.* at 2; Government Brief App. B at 28.

**6.** Government Brief App. A at 25–26.

**7.** *Id.* at 26.

**8.** *Id.* App. C at 34.

self-admitted member of the Black Hebrews.[9]

The government argued that the defendant's alleged membership in the Black Hebrews was significant to sentencing because his crime was part of a larger pattern of economic crimes committed by Black Hebrews to fund their "repatriation" to Israel. The government again referred to its earlier bond review memorandum:

A number of members of the Black Hebrew sect are fugitives from justice.

The FBI lists at least twenty-four individuals, identified as Black Hebrews, who are currently being sought on arrest and bench warrants.

Black Hebrews involved in criminal activity commonly tend toward crimes of fraud including stolen airline tickets, fraudulent credit card use, and bank fraud. These types of crimes give them the ability to move freely throughout the United States with little or no actual cost to them. Further, a number of the Black Hebrews have been identified as having obtained passports fraudulently.

The execution of search warrants at known Black Hebrew premises have led to the discovery of numerous bogus identifications many of which matched credit cards and/or checks discovered at the same time.

The Black Hebrews have houses throughout the United States where a fugitive can receive food, clothing and shelter.

Source information indicates that Black Hebrews charged with crimes in the United States are provided with the wherewithall, i.e., money and documents necessary to take them to Israel where a Black Hebrew community is currently residing, many of whom are fugitives.[10]

The government attached to its sentencing memorandum a collection of newspaper and magazine articles concerning the Black Hebrews, their beliefs and organization, as well as their alleged involvement in illegal activities. On the basis of the above information, the government argued that, "given the personal and group motivations for this crime . . . a substantial period of incarceration is required as a determent [sic] to future conduct of this type by the defendant and others involved with him." [11]

### B. Other Information Before the Court

In addition to the information presented in the government's memoranda, the court had before it a presentence report, the contents of which were summarized for the defendant by his counsel, and a letter from the defendant to the judge. The presentence report notes that both Lemon's former employer and a friend, when questioned by the probation officer, stated that they were aware that Lemon had some association with the Black Hebrews.[12]

The report, together with the defendant's letter, also describes Lemon's family background, education and employment history, and includes Lemon's own explanation of why he left his job, why he resorted to committing this offense, and how he obtained the stolen checks. To summarize briefly, Lemon described his upbringing as strongly achievement oriented, driving him toward a scholarship to an exclusive preparatory school and successful completion of a college education. After many years with the Howard University radio station (WHUR), Lemon said that he had become disappointed with the decline, under changing management, of the innovative and pioneering style that he had originally found so stimulating. As these policy differences developed, he began to lose interest and his performance declined. After he left the station for free lance work in December, 1980,[13] his financial condition deteriorated.

---

9. *Id.* App. A at 25 n. 5.

10. *Id.* App. C at 35.

11. *Id.* App. A at 26.

12. Presentence Report at 10. The presentence report was made part of the record on appeal, on a motion by the government, by order of the district court dated July 26, 1983.

13. There appears to be some confusion surrounding the termination date of Lemon's employment. The presentence report states at two points—once in discussing his employment

Rather than ask his family for help, and thus admit to them that his career and financial condition had faltered, he finally resorted to illegal conduct when a lucrative opportunity presented itself. Lemon stated that two checks totaling $9,500 were offered to him by someone to whom he paid $1000 for each check when it cleared his account. He did not identify that person, but he did say that the person was probably not a Black Hebrew. He stated that he had spent the money he deposited on clothes, Christmas presents, and a trip to New York. He expressed remorse and a desire to make restitution on several occasions—to the probation officer,[14] in his letter to the judge [15] and at the sentencing hearing.[16]

### C. The Sentencing Hearing

The greater part of the sentencing hearing concerned the reliability and relevance of the government's representations about defendant's membership or association with the Black Hebrews. Defense counsel emphasized Lemon's status as a first offender, his education and employment history, arguing that it was solely because of the defendant's alleged membership in the Black Hebrews that he risked a substantial period of imprisonment for what he described as a "paper crime." [17] Lemon strenuously denied membership, although he acknowledged knowing several members of the Black Hebrew sect, as well as members of other black religious and political organizations, through his work at the Howard University radio station. Lemon asserted that he had no knowledge of illegal activity by members of the Black Hebrews, and was therefore unable, not unwilling, to assist the prosecutors in their investigation.[18] The defense argued in summary that the prosecution had produced no reliable evidence that the defendant was a member of the Black Hebrews or that his offense was committed in furtherance of their illegal activities. Defense counsel continued:

Under these circumstances, I would move that Your Honor rule that the allegations of Mr. Lemon's affiliation with the Black Hebrews and the Government's theory that his criminal activity here was used to further the conspiracy of the Black Hebrews, that those allegations be disregarded by this Court in sentencing Mr. Lemon, and I would ask that your Honor rule on my motion after hearing from the Government before we proceed.

THE COURT: Mr. Reukauf, was your client extended an invitation by the U.S. Attorney's Office to assist in its investigation of this organization?

MR. REUKAUF: Yes, sir.

THE COURT: Was it declined, as Mr. Behr represents?

MR. REUKAUF: It was declined, Your Honor, because Mr. Lemon's position is that he is not a member of the organization and, therefore, he is not in a position to provide information about the

---

history and once in the concluding evaluation— that Lemon left WHUR in December (or late) 1980. In addition, the report states that Lemon commenced his next employment as a freelance writer and photographer for a magazine in July, 1981. However, in the report's initial summary of defendant's version of the motivation for his involvement in the offense, Lemon is said to have left WHUR in December, 1981, which is the same month in which he committed the offense. The December, 1981, date is cited in the government's supplemental memorandum, which argues that "[t]his sudden transformation in the life of an intelligent and educated man persuaded Judge Jackson that appellant 'had already determined to become a professional criminal.' " Supplemental Memorandum for Appellees at 3. Yet the judge, in his "comments and recommendations relative to parole," appears to have assumed that "Mr.

Lemon left his employment at WHUR in 1980." It appears to us that the single reference in the presentence report to a December, 1981, departure from WHUR is in error. But because we are remanding this case, the inconsistency can be more authoritatively resolved in future proceedings.

14. Presentence Report at 12.

15. Government Brief App. D at 38, 40.

16. *United States v. Lemon,* No. 82–234, Transcript of Sentencing Hearing, October 28, 1982 [hereinafter Sentencing Transcript], at 14.

17. *Id.* at 2–5.

18. *Id.* at 6.

organization. He knows certain people who are affiliated with the organization, in connection with his employment with Howard University Radio Station. He has interviewed people in this cult and other cults and other religious groups but he is not in a position to provide the Government with information about criminal activity within the group, and he has taken that position from the very beginning.

So the Government's offer is premised on its theory that he in fact is a member of the group.

Since he denies membership in the group, the offer is not one that can be accepted by him in any meaningful way.

THE COURT: You mean unless he is a member of the group he can't provide any information about it; is that correct?

MR. REUKAUF: Well, he cannot, he tells me, provide any information about any criminal activity of the Black Hebrew group.[19]

After briefly discussing the different versions of the circumstances surrounding his departure from WHUR, the Court continued:

THE COURT: You want me to rule on a motion to disregard any representations from the Government concerning membership or affiliation with the Black Hebrews?

MR. REUKAUF: Yes, sir.

THE COURT: What do you have to say about that, Mr. Behr?

MR. BEHR: Your Honor, it is our position that we have provided the Court with the basis of our theory and the relevance of it to the sentencing and that it is our position that the circumstances outlined n [sic] our opposition to the bond review motion and in our sentencing allocution do indicate rather strongly, if not conclusively, *that Mr. Lemon is a member of this organization and membership is relevant* in the Court's determination as to motivation and commission of this offense and to the likelihood of potential future offenses if Mr. Lemon (1) were

released on probation, or were sentenced in a rather minimal fashion.

Also we submit it supports our assertions that there is some deterrent effect that might come from a lengthy sentence in this case.

We submit that it is relevant to the Court's consideration.

As our legal memorandum indicates, the Court should consider all the facts and circumstances in sentencing a defendant.

We have not tried to make any allegations that are unsupported. We have provided, I think, the Court with a reasonable basis for our assumptions. We have outlined those facts we feel we could prove, if asked to do so, that support our theories, and maybe have gone even farther than Mr. Reukauf suggested.

We have not submitted to the Court unverified allegations of allegedly reliable informants. We have outlined observations made of individuals allegedly involved with Mr. Lemon and observations that are before the Court in this case.

The court is intimately concerned with the case of Miss Kegler involving checks of the same nature and the problems that we have experienced in that case, and I think it all adds up.

As we indicate, *it is our feeling he is a member of this organization and that is a relevant fact in sentencing.*

THE COURT: Do I understand your motion to be that I should disregard that information altogether, or that I give it less consideration than I might some other information?

MR. REUKAUF: I think that it is inappropriate for the Court to consider that Mr. Lemon has been seen in the company of people who belong to a group.

THE COURT: Suppose he was seen in the company of a known narcotics dealer, would I be justified in disregarding that?

19. *Id.* at 5–6.

MR. REUKAUF: No. Suppose he were seen in the company of known communists who advocated the overthrow of the United States. That is the difference between the narcotics dealer, it seems to me.

THE COURT: Because one is ostensibly a political organization and the other is ostensibly a criminal conspiracy?

MR. REUKAUF: Yes, sir; because the Government says you are a Black Hebrew, you are involved in a criminal conspiracy. They haven't charged Mr. Lemon with that. They haven't faced him with his accusers on that. They haven't provided reliable information that that is a fact, that Black Hebrew equals criminal conspiracy. All we know about the Black Hebrews is what the Government has shown us and what we can read in the newspapers, that it is a religious cult and that there are certainly allegations that members of the cult or maybe a lot of members of the cult are on the fringe and are committing criminal activities and funneling the monies to the cult.

THE COURT: Let me see if I understand your motion.

Do I understand it to be that the information should be disregarded altogether, that it is improper for me to consider that?

MR. REUKAUF: Yes, sir.

THE COURT: The motion is denied.[20]

The prosecutor thus argued the same theory advanced in his memorandum on sentencing that membership in the Black Hebrews was the relevant fact and that the government had established such membership.

The court then inquired about the circumstances of the defendant's departure after nine years from his employment at WHUR. The defense acknowledged that there was a discrepancy between the account of the defendant, who ascribed his declining performance to policy differences with management, and the account of his former employer, who speculated that it was due to increased preoccupation with outside interests.[21]

The government, in its final comments, reported that checks had been written on Lemon's account for clothing, stereo equipment, tickets, and other personal items, and argued that these expenditures were inconsistent with Lemon's claim that he had committed the crime because of financial need. The government also noted that Lemon had failed to respond to its request for information about the person from whom he got the stolen check.[22]

The defendant, in his own comments to the court, again declared his remorse and again strenuously denied his involvement with the Black Hebrews.[23] Presented with the above information, the judge immediately and without any statement of reasons pronounced a sentence of four years maximum imprisonment with the possibility of parole after 16 months.[24] Although this sentence was well within the statutory maximum of ten years imprisonment and a $10,000 fine,[25] government counsel conceded at oral argument that it is an unusually severe sentence for a first offender.

## II. The Court's Basis for Sentencing

Before attacking the prickly legal issue of whether and in what manner the court could properly consider the government's representations concerning Lemon's involvement with the Black Hebrews, we should first determine whether the court relied to any significant extent on this information in imposing sentence. This task is made more difficult by the court's failure to provide any explanation for its decision at the time of sentencing. We must thus attempt to reconstruct the court's reasoning from a variety of sources. We conclude from our inquiry that, although the sen-

---

20. *Id.* at 7–10 (emphasis added).

21. *Id.* at 10.

22. *Id.* at 12–13.

23. *Id.* at 14.

24. *Id.*

25. *See* 18 U.S.C. § 2314.

tencing judge does not appear to have relied on the specific allegation that the defendant was a member of the Black Hebrews, he does appear to have given substantial weight to the government's representations in support of that allegation. In other words, he appears to have relied on information about the defendant's alleged associations with the Black Hebrews.

Although the court did not provide an explanation for imposing the sentence, he did make the following "comments and recommendations relative to parole" on Form A.O. 235, entitled "Report on Sentenced Offender by United States District Judge," [26] completed on the date of the hearing, October 28, 1982.

Although this conviction represents this defendant's first, so far as is known, I am of the opinion that when Mr. Lemon left his employment at WHUR in 1980, he had already determined to become a professional criminal. His lack of candor with the probation officer, and his unwillingness to co-operate with the U.S. Attorney's Office in its investigation of an organization known as the Black Hebrews, whether or not he is a member of it, casts considerable doubt on the genuiness [sic] of any expressions of remorse or protestations of reform. Given his intelligence and education I believe him to be a danger to the community from which I conclude he should be isolated. I think his potential for rehabilitation and his deterrability are mimimal at this point in his life.

The government now takes the position that this report demonstrates that "the evidence of appellant's membership in the Black Hebrews was a minor, even negligible, factor in the judge's determination as to what sentence to impose." [27] Before reviewing this document, which was only made available to counsel after oral argument, the government agreed with counsel for the defense that the judge had relied on evidence of the defendant's membership in the Black Hebrews as a factor in sentencing.[28]

We do not view the judge's "comments and recommendations relative to parole" on Form A.O. 235 as the equivalent of an explanation for the sentence imposed. First, the form does not call for a statement of reasons for the sentence imposed; it is intended for the use of the Parole Commission and prison officials in future dealings with the defendant. While the form might be interpreted as requesting an explanation of the decision to impose any sentence involving incarceration as opposed to immediate probation, it does not call for any explanation of the length of the imprisonment. Furthermore, Form A.O. 235 does not elicit the judge's conclusions with respect to particular matters the accuracy or propriety of which were contested by the defendant before sentencing.[29] The judge's response here bears out these observations. The statement is very brief and fails to address either the sufficiency of the evidence concerning defendant's membership in the Black Hebrews or the propriety in any event of considering this evidence; yet

26. The form requests the judge to "[g]ive comments regarding the appropriateness of parole in view of the present offense, prior criminal background and any mitigating or aggravating circumstances."

27. Supplemental Memorandum for Appellee at 1.

28. The government based its brief on this assumption, and government counsel stated at oral argument that the judge appeared to have relied on the information.

29. There is empirical evidence that Form A.O. 235 typically fails to elicit the judge's resolution of factual disputes such as the one in this case. See Fennel & Hall, *Due Process at Sentencing:*

*An Empirical and Legal Analysis of the Disclosure of Presentence Reports in Federal Courts,* 93 Harv.L.Rev. 1613, 1680–83 (1980). In direct response to these shortcomings, a recent amendment to Rule 32 of the Federal Rules of Criminal Procedure requires the sentencing judge either to make a finding on any fact in dispute or to indicate that the matter will not be considered. See F.R.Crim.P. 32(c)(3)(D) (effective August 1, 1983) and Advisory Committee Notes. Although this requirement did not apply to the sentencing proceedings reviewed here, it would appear to apply to any new sentencing proceedings on remand. See *infra* note 59.

these issues were the main subjects of dispute between the government and the defendant in sentencing proceedings. Thus, while it is reasonable to assume that the considerations identified by the judge on Form A.O. 235 as relevant to parole were also prominent in his sentencing decision, we cannot assume that those considerations were the exclusive basis for the decision.

Looking first to the judge's comments and recommendations, it appears that the judge concluded that the defendant (1) had already determined to become a professional criminal in 1980; (2) had displayed a lack of candor with the probation office; and (3) had been unwilling to cooperate with the government in its investigation of the Black Hebrews. These factors led the judge to conclude further that the defendant's "potential for rehabilitation and his deterrability are minimal at this point in his life."

(1) The judge's stated belief that the defendant had already determined to become a professional criminal when he left his job at WHUR in 1980 does not echo any such conclusion expressed in the presentence report, which merely described the period during which Lemon left his employment as one of relative instability.[30] Yet the only significant information presented to the sentencing judge outside of the presentence report that might have led him to this conclusion was the defendant's alleged involvement with the Black Hebrews.

(2) The judge's conclusion that the defendant had exhibited a "lack of candor" with the probation officer may or may not be based on his denial of membership in the Black Hebrews. Based on our reading of the probation officer's observations in the presentence report, we conclude that the judge's belief was at least indirectly based on the government's claim that the defendant's crime was motivated by his involvement with the Black Hebrews, as compared

with the defendant's own explanation of his motivation.

(3) Finally, the judge's characterization of the defendant's "unwillingness to cooperate with the U.S. Attorney's Office in its investigation of an organization known as the Black Hebrews, whether or not he is a member of it," appears to disclaim reliance on the specific allegation of membership. Yet this conclusion nevertheless appears to rest to some degree on the government's representations in support of its claim that he was a member of the organization, and not merely on defendant's acknowledgment that he was acquainted with some members of the organization through his employment with WHUR. The government specifically requested information about illegal activity among the Black Hebrews, and the defendant denied knowledge of any such illegal activity. The defendant's knowledge of those activities, and thus his ability to respond to the government's request, could hardly be inferred merely on the basis of his admitted acquaintance with some members through his work.

Our conclusion that the judge relied on the government's representations about the defendant's involvement with the Black Hebrews in sentencing the defendant is strongly bolstered by his flat denial of the defense motion that he disregard those representations in sentencing the defendant. *See supra* at 928. Because the judge gave no explanation for his denial of the defense motion, we cannot be certain why or for what purpose the judge deemed it proper and relevant to consider the defendant's association with the Black Hebrews. We do know that the prosecutor devoted his entire sentencing memorandum and most of his argument at the sentencing hearing to the allegations of defendant's membership in the Black Hebrews and the significance of membership itself in sentencing. Therefore, if the judge, in denying the defense

---

**30.** The government asserts in its supplemental memorandum that the judge's conclusion is reasonable given the defendant's sudden turn to criminal activity in the ·same month that he left his employment. This assertion is based on a single reference in the presentence report

that appears to be in error. We assume, as did the sentencing judge, that the defendant left his job at WHUR in December, 1980, a full year before committing the offense, as stated twice in the presentence report. *See supra* note 13.

motion, signaled his acceptance of the government's position with respect to the information, he may have considered it highly significant and broadly relevant. Although it does not appear to us that the judge fully accepted the government's arguments, his failure to explain his denial of the defense motion and the sentencing decision itself leads us to look to those arguments as an additional source influencing the judge's own reasoning.

The judge's reliance on the government's representations about the defendant's involvement with the Black Hebrews is further indicated by the otherwise positive aspect of the defendant's life. In particular, it was argued by the defendant and conceded by the government at oral argument that it is unusual for a first offender under this statute to receive a sentence of this severity.[31]

Finally, we note that both the government and the defense in this appeal had concluded on the basis of the sentencing proceedings that the judge did rely on the government's representations about membership in the Black Hebrew sect.[32] Although the government has now revised its position in light of the judge's comments on Form A.O. 235, the limitations of that document require us to consider the whole record, including statements and rulings made at the sentencing hearing. We conclude from the information before the judge at sentencing, the sentencing hearing and the judge's "comments and recommendations relative to parole" on Form A.O. 235 that the judge relied on the defendant's alleged failure to cooperate with the government in its investigation of the Black Hebrews and on the government's representations about the defendant's association with the Black Hebrews, but not on the particular allegation that the defendant was a member of the Black Hebrews.

### III. Issues

■■■ The sentencing judge has wide discretion in imposing a sentence. The judge may " 'conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.' " *Roberts v. United States,* 445 U.S. 552, 556, 100 S.Ct. 1358, 1362, 63 L.Ed.2d 622 (1980) (quoting *United States v. Tucker,* 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972)). Thus, it is provided by statute:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. § 3577. If the sentence imposed is within statutory limits, it is generally not subject to appellate review in the absence of constitutional concerns. *United States v. Tucker,* 404 U.S. at 447, 92 S.Ct. at 591–592.

■ Despite the trial judge's broad discretion in sentencing, this court recently emphasized that "it is also fundamental that *some* limitation on the range of permissible sentencing considerations is required by the constitutional guarantee of due process." *United States v. Campbell,* 684 F.2d 141, 153 (D.C.Cir.1982). The Supreme Court has clarified an important distinction that bears upon the task before us:

> Appellate modification of a statutorily authorized sentence ... is an entirely different matter than the careful scrutiny of the *judicial process* by which the particular punishment was determined. Rather than an unjustified incursion into the province of the sentencing judge, this latter responsibility is, on the contrary, a necessary incident of what has always been appropriate appellate review of criminal cases.

*Dorsyznski v. United States,* 418 U.S. 424, 443, 94 S.Ct. 3042, 3053, 41 L.Ed.2d 855

---

**31.** Of course, we do not suggest that the sentence imposed was unreasonable. We refer to the relative severity of the sentence only as additional reason to believe that the judge considered the government's representations about the Black Hebrews.

**32.** *See supra* note 28.

(1974) (emphasis in original) (citing *United States v. Hartford,* 489 F.2d 652, 654 (5th Cir.1974)). Thus, it is established that a sentence may not be based on "improper or inaccurate information." *Dorsyznski v. United States,* 418 U.S. at 431 n. 7, 94 S.Ct. at 3047 (1974); *United States v. Campbell,* 684 F.2d at 153; *United States v. Dancy,* 510 F.2d 779, 784 (D.C.Cir.1975).

The defendant argues that his sentence was based on inaccurate and unreliable information in violation of the due process clause and on considerations that are improper under the first amendment. We discuss first the legal underpinnings of each of the defendant's objections.

A. *Reliability of Information Used in Sentencing*

 The requirements of due process are not suspended with the pronouncement of guilt, but continue to operate in the sentencing process. *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). Thus, the sentencing judge may not rely on mistaken information or baseless assumptions. *Roberts v. United States,* 445 U.S. 552, 556, 100 S.Ct. 1358, 1362, 63 L.Ed.2d 622 (1980); *United States v. Tucker,* 404 U.S. 443, 447, 92 S.Ct. 589, 591–592, 30 L.Ed.2d 592 (1972); *Townsend v. Burke,* 334 U.S. at 740–41, 68 S.Ct. at 1255. As we noted in *United States v. Bass,* 535 F.2d 110 (D.C.Cir.1976), however, courts must be concerned not merely when a sentencing judge has relied on demonstrably false informa-

tion, but "when the sentencing process created a significant *possibility* that misinformation infected the decision." [33]

The defendant especially urges on us the reasoning and result of *United States v. Weston,* 448 F.2d 626 (9th Cir.1971), *cert. denied,* 404 U.S. 1061, 92 S.Ct. 748, 30 L.Ed.2d 749 (1972), in which the court vacated a sentence that was based on government allegations that, although not proven false, were denied by the defendant and not supported by reliable evidence. Weston had been convicted of possession of heroin. In its sentencing allocution, the government asserted in the presentence report that she was "the chief supplier to the Western Washington area," according to federal investigators.[34] The defendant strenuously denied these allegations. Nevertheless, on the basis of the government's information, the judge imposed the maximum sentence of twenty years.

The evidence supporting the government's allegations was found by the reviewing court to be sorely inadequate. In addition to the facts surrounding the defendant's arrest and the search of her house, a named informant had indicated that on one occasion a trip to Mexico was about to be made, and that Weston was distributing quantities of heroin for delivery to select customers. The reviewing court decried the sentencing court's reliance on "unsworn evidence detailing otherwise unverified statements of a faceless informer," *id.* at 631, and vacated the sentence, directing the dis-

---

**33.** 535 F.2d at 118 (emphasis in original). *See also United States v. Campbell,* 684 F.2d 141, 154 (D.C.Cir.1982) (where there is a possibility that judge unfairly considered trial evidence on charges on which defendant was acquitted, "we should review the record to insure that there is a persuasive basis for the conclusions reached by the sentencing court"); *Scott v. United States,* 419 F.2d 264, 266 (D.C.Cir.1969) (dicta) (appellate court has duty to "scrutinize the sentencing process to insure that the trial judge has considered the information available with some regard for its reliability"). The precise holding of *Scott,* that the judge may not base a harsher sentence on the basis of his belief that the defendant lied in pleading innocent and in conducting his defense, was disapproved in *United States v. Grayson,* 438 U.S.

41, 51–52, 98 S.Ct. 2610, 2616–2617, 57 L.Ed.2d 582 (1978).

**34.** The presentence report elaborated:

"According to their investigation, Mrs. Wallace travelled to Mexico or Arizona periodically to obtain approximately $60,000 worth of heroin. She then would distribute the drug to various dealers in Western Washington earning approximately $140,000.00 profit on the $60,000 investment. Narcotics agents felt that she might have made these trips as frequently as every two weeks...."

"Narcotics agents advised that four of Mrs. Wallace's distributors have been apprehended and two have already been sentenced."

*United States v. Weston,* 448 F.2d at 628.

trict court "not [to] rely upon the information contained in the presentence report unless it is amplified by information such as to be persuasive of the validity of the charge there made." *Id.* at 634.

We discussed *Weston* at length and with approval in *United States v. Bass,* 535 F.2d 110. The defendant in *Bass,* however, had not disputed the accuracy of the government's allegation that he was "a well-known and persistent narcotic trafficker." *Id.* at 117. We saw "no reason to bar sentencing judges from considering relevant information whose accuracy is not disputed," and refused to vacate the sentence. *Id.* at 121. In the event that the defendant contested the allegations in later proceedings, we suggested that "the district court might request the Government to submit some verification .... Alternatively, the court might find existing factual support or indicia of reliability for the allegations .... Or the district court simply could resentence appellant, making clear that it was not considering the disputed information." *Id.*[35]

Other circuits have also recognized the validity of the *Weston* principle.[36] The Second Circuit confronted the question of the reliability of information considered in sentencing in a context not dissimilar from this. In *United States v. Fatico,* 579 F.2d 707 (2d Cir.1978), the government had alleged that the defendants were "members of the Gambino organized crime family and important figures in the upper echelon of organized crime activity." *Id.* at 709. The defendants denied this allegation and the trial court therefore properly called for corroboration from the government. *Id.* at 713.

The Government then offered to support its allegations at a sentencing hearing by the testimony of the former head of the FBI's Organized Crime section in the New York office, based upon information furnished to him by a reliable confidential informant, allegedly a member of the Gambino Family. The Government objected to disclosure of the confidential source for the obvious reasons that both his life and usefulness as an informant would be jeopardized. However, the Government proffered additional evidence to corroborate the informant, consisting of the testimony of two coconspirators who turned Government's evidence in the trial and who are under the Government witness protection program. *Id.* at 709. The co-conspirators had given detailed descriptions of incidents that strongly supported the government's allegations. In addition, the government offered the testimony of two police officers who had independently observed the defendant with leading members of the family, and at a funeral service for the "boss of bosses" to which only "family members" were admitted. Finally, the defendants had long records of criminal activity clearly associated with organized crime. Faced with this evidence, the sentencing judge nevertheless or-

**35.** This guidance was followed by the trial court in *United States v. Hall,* 571 F.2d 649 (D.C.Cir.1977) (per curiam), *cert. denied,* 435 U.S. 926, 98 S.Ct. 1492, 55 L.Ed.2d 520 (1978): "At the trial judge's request, the government supplied him with a supplemental presentence report containing hearsay information which defendant vigorously disputed. When called upon to verify this information, the government conceded its inability to do so in several respects and withdrew a portion of the report." *Id.* at 650. The judge then "made clear his attempt to ignore—to the extent humanly possible—those allegations which remained unsubstantiated." *Id.* Under these circumstances, we upheld the sentence imposed.

**36.** *See, e.g., United States v. Baylin,* 696 F.2d 1030, 1040 (3d Cir.1982) ("We find indisputable the principle announced in *Weston* that, as a matter of due process, factual matters may be considered as a basis for sentence only if they have some minimal indicium of reliability beyond mere allegation"); *United States v. Fatico,* 579 F.2d 707, 713 (2d Cir.1978) ("the reliability of evidence that is difficult to challenge must be ensured through cross-examination or otherwise, by demanding certain guarantees of reliability."); *United States v. Woody,* 567 F.2d 1353, 1364 (5th Cir.1978), *cert. denied,* 436 U.S. 908, 98 S.Ct. 2241, 56 L.Ed.2d 406 (1978) (following *Weston* ); *United States v. Harris,* 558 F.2d 366, 376 (7th Cir.1977) (discussing *Weston* with approval). *See also United States v. Marshall,* 719 F.2d 887 (7th Cir.1982) (upholding district court's use of information it explicitly and reasonably found reliable).

dered the evidence suppressed on the basis of its unreliability. While stressing the importance of reliability, the Second Circuit reversed, holding that the standards suggested by *Weston* had been met, and that "Due Process does not prevent use in sentencing of out-of-court declarations by an unidentified informant where there is good cause for the non-disclosure of his identity and there is sufficient corroboration by other means." *Id.* at 713 (citation omitted).

█ Courts in these cases have confronted simultaneously two evidentiary issues: what kind of evidence is sufficiently reliable and how much evidence is enough. It is with good reason that these questions have not been neatly scissored. As in *Fatico,* the statements of an unidentified informant, otherwise of dubious value, may be useful if corroborated by additional means. By the same token, many pieces of evidence may be unpersuasive if each depends on uncorroborated hearsay. In short, the requirements of due process in the context of a challenge to the accuracy of information to be used in sentencing cannot be reduced to a simple formula. The extensive discussion of the supporting evidence found insufficiently reliable in *Weston* and that found sufficiently reliable in *Fatico* provide useful guideposts at each end of the spectrum. In locating this case along that spectrum, we continue the case-by-case development of a necessarily flexible due process standard. We begin that process by first identifying the allegations that properly could be considered if supported by sufficiently reliable evidence. We consider the government's contentions, first, that the defendant failed to cooperate in its investigation of the Black Hebrews, and, second, that he was a member of the Black Hebrews.

### B. The Defendant's Alleged Failure to Cooperate in the Investigation

On October 12, 1982, the United States Attorney sent a letter to the defendant's attorney requesting the defendant's cooperation in an investigation of the Black Hebrews.[37] The letter stated:

> As you are aware we believe that Mr. Lemon has information that would be helpful to us in our continuing investigation of illegal activities being conducted by the members of the Black Hebrew sect. We are interested in learning from him, particularly, the facts and circumstances surrounding his obtaining of the checks charged in the indictment against him and the disposition of the items purchased through the use of the checking account in question. We are further interested in learning from him any other information he might have about illegal activities of members of the Black Hebrew sect.
>
> We are extending this offer to your client presentence so that we can inform Judge Jackson of your client's cooperation or lack of cooperation at the time of sentencing.

The attorney for the government reported in his memorandum on sentencing and at the hearing that the defendant had failed to respond to this request.[38]

The defendant has not offered any explanation for his failure to identify the person from whom he obtained the checks; for instance, he does not appear to claim that he is unable to identify the person.[39] However, the defendant has stated that he is unable to provide any information about criminal activity in the Black Hebrew group, and is therefore unable to "cooperate" with the government in this aspect of

---

37. The letter was attached to the government's memorandum on sentencing and appears in the record as Attachment C.

38. Government Brief App. A at 26; Sentencing Transcript at 13.

39. It is unclear from the defendant's own account of the circumstances under which he obtained the stolen checks whether or not he claimed to be unable to identify the individual

who he said approached him. Because we are remanding this case to the district court, the defendant will have an opportunity to clarify whether he is unable to identify the individual or has any other explanation which, if true, would be a valid reason for not doing so. In that case, the judge could not reject that reason summarily without an appropriate inquiry into the veracity of the defendant's claim.

its investigation.[40] Although he sometimes asserted that he was unable to provide information *because* he was not a member, a proposition that the judge very properly questioned,[41] we understand the overall thrust of his statements to profess lack of knowledge about any illegal activities of the Black Hebrews.

In *Roberts v. United States,* 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980), the Supreme Court held that a sentencing court may consider, as one factor in imposing sentence, a defendant's refusal to cooperate with officials investigating a criminal conspiracy in which he was a confessed participant. In *Roberts,* however, the court was careful to note the absence of any reason for the defendant's refusal to cooperate despite "repeated requests ... over a period of three years." 445 U.S. at 557, 100 S.Ct. at 1362. In particular, the court noted that the defendant had not contended that "he was unable to provide the requested assistance." *Id.* at 557, 100 S.Ct. at 1362. In short, "neither he nor his lawyer offered any explanation to the sentencing court." *Id.* Furthermore, the court noted that the defendant's claim on appeal that "his failure to cooperate was justified by legitimate fears of physical retaliation and self-incrimination .... would have merited serious consideration if they had been presented properly to the sentencing judge." *Id.* Justice Brennan added in his concurring opinion that "if a justification were proffered, the judge would then proceed to determine its veracity and reasonableness." *Id.* at 563, 100 S.Ct. at 1366.

■ Because the defendant does not appear to deny that he was able to identify the individual from whom he received the stolen check, we conclude that, under *Rob-*

*erts,* his failure to do so in response to the prosecution's specific request for this information may be considered as one factor in sentencing.[42] On the other hand, the defendant repeatedly denied any knowledge of illegal activities of the Black Hebrews. Although the judge regrettably made no explicit inquiry into the veracity of Lemon's claim that he was unable to provide the information requested, his rejection of this claim is implicit in his apparent reliance on the failure to cooperate.[43] In any event, his reliance on the failure to cooperate in this facet of the government's investigation can be upheld, in the face of the defendant's denial that he was able to cooperate, only if there was sufficiently reliable evidence that the defendant did have information about those activities. We assume, as did the government, that the Black Hebrews are engaged not only in illegal activities but also in legitimate activities. It would therefore not be appropriate, particularly given the first amendment concerns discussed below, to infer the defendant's knowledge of illegal activities merely from evidence of innocent associations with Black Hebrews. Due process in this context requires some identifiable link between the defendant and illegality among the Black Hebrews.

C. *The Defendant's Membership in the Black Hebrew Sect*

The defendant not only denies the government's allegation that he is a member of the Black Hebrews; he also claims that the first amendment bars the consideration of evidence of his alleged affiliation with the Black Hebrews in the absence of a finding that he intended to further the group's illegal aims. We consider first the operation of the first amendment generally

---

40. Sentencing Transcript at 6, quoted *supra* at 927–928.

41. *Id.*

42. Of course, the defendant may be given another opportunity to cooperate in this respect before a second sentencing decision is made on remand.

43. It seems clear on the basis of the judge's comments at the sentencing hearing, Sentencing Transcript at 6, and in the report to the Parole Board, *see supra* at 930, that the judge considered the defendant's failure to cooperate in the prosecutors' investigation of the Black Hebrews. It is less clear whether he specifically considered the defendant's failure to identify the person from whom he received the stolen checks, a point stressed by the government.

in the context of sentencing. Because we conclude that the first amendment makes the consideration in sentencing of certain factors improper, we must decide, second, whether the Black Hebrew sect is an organization protected by the first amendment. Concluding that it is, we discuss finally the first amendment principles that govern the consideration of membership or affiliation with such a group for the purpose of sentencing. We agree with the defense that such affiliation ordinarily may be considered only if the defendant specifically intended to further the illegal aims of the organization. In this case, however, the defendant's association with Black Hebrews may be used for the narrow purpose of determining whether he had knowledge of the illegal activities of the group and could therefore be held responsible for his failure to cooperate with the government in its investigation of those illegal activities.

### (1) *The First Amendment in Sentencing*

■ There can be no doubt that the constitution continues to operate, even after a valid conviction, in the sentencing process. Thus, a defendant may not be given a higher sentence in retaliation for invoking the fifth amendment privilege against self-incrimination. *United States v. Garcia,* 544 F.2d 681, 685 (3d Cir.1976);[44] or for successfully appealing his conviction, *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). As the Supreme Court stated in *Bordenkircher v. Hayes,* 434 U.S. 357, 363, 98 S.Ct. 663, 667–

668, 54 L.Ed.2d 604, "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." Accordingly, a court may not punish an individual by imposing a heavier sentence for the exercise of first amendment rights.

Although the extent to which the first amendment limits the discretion of a sentencing court has received surprisingly little attention, the Eighth Circuit seems justified in its confident pronouncement that "[c]onsideration of political beliefs, as distinguished from criminal activity, would clearly be impermissible in determining defendants' sentences, because it would impair the rights of the defendants under the First Amendment, protecting public expression of their political beliefs, by word and symbols." *United States v. Bangert,* 645 F.2d 1297, 1308 (8th Cir.1981), *cert. denied,* 454 U.S. 860, 102 S.Ct. 314, 70 L.Ed.2d 158 (1981).[45] The First Circuit also took as self-evident the applicability of the first amendment in sentencing in *United States v. Sachs,* 679 F.2d 1015 (1st Cir.1982). Although the court rejected the defendant's argument that his sentence for obstructing the use of an elevator was based on the political context of his actions, it assumed that it would be constitutionally impermissible to consider political beliefs in sentencing. This principle had been made explicit in *O'Brien v. United States,* 376 F.2d 538 (1st Cir.1967), *vacated on other grounds,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).[46] Recognizing the possibility that

---

**44.** *Cf. Roberts v. United States,* 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980) (refusal to cooperate may be considered in sentencing where neither fifth amendment privilege nor any other explanation offered to judge).

**45.** The sentence in *Bangert* was upheld because the judge "took special care to make it clear that he was not sentencing the defendants because of their political beliefs or political activities." 645 F.2d at 1308.

**46.** In *O'Brien,* the First Circuit invalidated an amendment to the Selective Service statute that singled out for special punishment those who did not simply fail to retain their draft cards, but destroyed them in a manner that was, in the court's view, clearly associated with

opposition to the war. The court upheld the defendant's conviction, however, by construing a separate provision requiring possession of draft cards as creating a lesser included offense. Nevertheless, the court remanded the case to the district court for resentencing because of the possibility that "the court took into consideration what the statute, by virtue of the amendment, indicated to be aggravating circumstances." *Id.* at 542. The Supreme Court reversed the First Circuit's conclusion that the statutory amendment proscribing the burning of draft cards violated the first amendment. *United States v. O'Brien,* 391 U.S. at 372, 88 S.Ct. at 1676. The Supreme Court, however, did not disturb the First Circuit's assumption that *if* the government may not di-

the defendant may have received a higher sentence because, in burning his draft card, he was expressing his opposition to the war, the court remanded for resentencing. "For the court to conclude ... that the impact of such conduct would impede the war effort, and measure the sentence by the nature of his communication, would be to punish defendant, pro tanto, for exactly what the First Amendment protects." *Id.* at 542. The court held that "fairness to the defendant requires that he be resentenced upon considerations affirmatively divorced from impermissible factors." *Id.* Similarly, the Second Circuit in *United States v. Brown,* 479 F.2d 1170 (2d Cir.1973), left no doubt that it would be improper for the judge to base his sentence for refusal to report for induction on the defendant's unpopular political beliefs, although it was satisfied that the judge did not do so. *Id.* at 1174.

■ These decisions declare what we believe the constitution compels: A sentence based to any degree on activity or beliefs protected by the first amendment is constitutionally invalid.[47] We must therefore determine whether the Black Hebrew sect is an organization protected by the first amendment, and what the contours of first amendment protection are for such an organization in the context of this case.

## (2) *The Black Hebrews and Freedom of Association*

■ The government does not contest the defendant's claim that the Black Hebrew sect is a religious organization. According to·our perusal of the articles submitted by the government, the Black Hebrews have a set of beliefs based in part on the Torah; they observe a Sabbath by fasting and by religious services; they adhere to a vegetarian diet as part of their beliefs. It is not necessary for us to make a factual determination whether the Black Hebrew sect is a religion, however, because the defendant does not claim any special protection or privilege under the free exercise clause;[48] he claims only the first amendment freedom of association that protects membership or participation in groups based on a broad range of political, economic, social, moral, religious and other beliefs. Association with the Black Hebrews, whether or not their beliefs were ultimately determined to be religious, is protected by the broad guarantee of freedom of association unless the group were found to be a sham whose members did not sincerely share the beliefs they asserted,[49] but only used them cynically to conceal a criminal conspiracy. Given the government's appar-

rectly punish conduct under the first amendment, it may not indirectly punish the conduct by considering it as an aggravating factor in imposing sentence.

47. Similar principles govern the determination of bail status: appellate courts have seriously limited the extent to which protected political speech and association may be the basis for revoking or denying bail. *See, e.g., Williamson v. United States,* 184 F.2d 280 (2d Cir.1950) (Jackson, J., Circuit Judge); *Leary v. United States,* 431 F.2d 85 (5th Cir.1970); *Bridges v. United States,* 184 F.2d 881 (9th Cir.1950); *United States ex rel. Means v. Solem,* 440 F.Supp. 544 (D.S.D.1977).

48. The free exercise clause in some cases requires the exemption from general regulations of an individual who claims that the regulation either interferes with behavior dictated by religious belief, *see, e.g., Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965.(1963), or compels behavior forbidden by those beliefs, *see, e.g., Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). In such cases, courts must perform the sometimes diffi-

cult task of determining whether a set of beliefs is religious in nature. *See, e.g., Wisconsin v. Yoder,* 406 U.S. at 215, 92 S.Ct. at 1533; *Africa v. Pennsylvania,* 662 F.2d 1025 (3d Cir.1981), *cert. denied,* 456 U.S. 908, 102 S.Ct. 1756, 72 L.Ed.2d 165 (1982); *International Society for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430 (2d Cir.1981); *Founding Church of Scientology v. United States,* 409 F.2d 1146 (D.C.Cir. 1969), *cert. denied,* 396 U.S. 963, 90 S.Ct. 434, 24 L.Ed.2d 427 (1969). To demonstrate that the Black Hebrew sect is not a religion, the government would have to show that the dogma, services and ceremonies of the Black Hebrews, all of which are, in form at least, characteristic of many well-established religions, do not fulfill the definition of religion that must be met to claim the guarantees of the free exercise clause. Such a showing would not suffice to defeat the defendant's first amendment claim, however. *See infra.*

49. Sincerity can be the only test, for any inquiry into the truth or falsity of beliefs is barred by the first amendment. *See, e.g., United States v. Ballard,* 322 U.S. 78, 86–87, 64·

ent acquiescence in the defendant's claim that the Black Hebrew sect is a religious organization, we can comfortably conclude for the purposes of this appeal that the group is protected by the first amendment.[50]

Our conclusion that the Black Hebrew sect is an association protected by the first amendment does not, of course, wholly immunize its activities from state regulation. Indeed, the government has offered to prove that a substantial number of Black Hebrews are engaged in illegal activity clearly subject to criminal prosecution. As we have noted, the defendant does not claim for the Black Hebrews any special privileges or protections, such as those sometimes afforded religious organizations, from otherwise legitimate government regulation.[51] In the relatively uncomplicated context of a claim that one is being punished for association with a protected organization, general first amendment principles govern. We are thus required to determine the contours of first amendment protection from state imposed punishment for membership in or association with a protected group, some of whose activities are illegal and legitimately subject to criminal prosecution.

### (3) The First Amendment and Protected Groups with Illegal Aims

 Outside the sentencing context, it is axiomatic that the first amendment guarantees freedom of association with religious and political organizations, however unpopular. Thus, the government cannot punish an individual for mere membership in a religious or political organization that embraces both illegal and legal aims unless the individual specifically intends to further the group's illegal aims. *United States v. Robel,* 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); *Elfbrandt v. Russell,* 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966); *Aptheker v. Secretary of State,* 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); *Scales v. United States,* 367 U.S. 203, 229, 81 S.Ct. 1469, 1486, 6 L.Ed.2d 782 (1961).[52] This well-established constitutional principle limits not only the government's power to prescribe criminal penalties, as in the *Scales* case, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782, but its power to revoke a passport, *Aptheker v. Secretary of State,* 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964), to regulate admission to the bar, *Baird v. State Bar of Arizona,* 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971), and to deny public employment, *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675,. 17 L.Ed.2d 629 (1967).

 These cases leave no doubt that the first amendment proscribes punishment of an individual for membership in a protected organization unless the organization has illegal aims and the individual intends to

S.Ct. 882, 886–887, 88 L.Ed. 1148 (1944); *Founding Church of Scientology v. United States,* 409 F.2d at 1156.

**50.** *Cf. Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981) (state does not dispute that communication by Krishnas is protected by first amendment); *Founding Church of Scientology v. United States,* 409 F.2d 1146, 1160 (D.C.Cir.1969) (group protected by free exercise clause, given uncontested prima facie case for religious status); *Long v. Parker,* 390 F.2d 816, 820 (3d Cir.1968) (Black Muslim beliefs treated as religious and protected by first amendment, given uncontested claim of religious status). Because we recognize ambiguity in the government's position, and because the record before us is very scanty with respect to this issue, we leave it open to

the government on remand to attempt to establish that the Black Hebrew group is not based on religious beliefs or on any beliefs protected by the first amendment. The burden they would bear is heavy.

**51.** Such a claim would raise the difficulties sometimes encountered in attempting to accommodate the free exercise of religion without running afoul of the establishment clause. *See Sherbert v. Verner,* 374 U.S. at 413–417, 83 S.Ct. at 1799–1801 (Stewart, J., concurring).

**52.** Although these cases all concern political organizations, religious organizations have never received less solicitous treatment under the first amendment than organizations advocating the overthrow of the government; indeed, they have frequently received more favorable treatment. *See supra* note 48 and cases cited.

further those aims. We believe that this central tenet of the first amendment must be observed in the context of sentencing as well. Thus we reject the argument pressed by the government throughout the sentencing proceedings that the defendant's alleged membership in the Black Hebrews was a significant and a permissible consideration in sentencing. Whether or not the evidence of defendant's membership were sufficiently reliable, mere membership would be an impermissible factor in sentencing.

However, the sentencing judge appears to have relied not on the government's specific allegation of membership but on its representations in support of that allegation, which concerned the defendant's alleged associations with members of the Black Hebrews. Of course, the defendant's freedom of association is no less implicated when informal affiliation as opposed to formal membership is made the basis for a harsher sentence. Thus it is evident that the court's reliance on information about the defendant's alleged associations with the Black Hebrews cannot be upheld unless the defendant intended to further the organization's illegal activities.

This does not mean, as the defendant appears to argue, that the government must necessarily show that the proceeds of the offense for which the defendant was convicted were intended to benefit the Black Hebrews.[53] Such a showing would of course be the strongest evidence of the defendant's intent to further the illegal aims of the Black Hebrews, but it is not the only evidence that would establish the requisite intent and satisfy the first amendment.

On the other hand, the limitations of the first amendment would be easily evaded if the defendant's illegal intent could simply be inferred from evidence of his association with members of the group. Although direct evidence of the defendant's intent is probably unavailable and in any event not required, there must be sufficiently reliable evidence of the defendant's connection to illegal activity within the Black Hebrews to insure that he is not being given a harsher sentence for mere association with the group and its legitimate aims and activities. If the government introduces into the sentencing process allegations about the defendant's association with an organization, and the defendant objects, at least in part on the basis of a plausible claim that any association the defendant may have with the organization is constitutionally protected, the judge ordinarily may not consider the government's allegations in sentencing without ascertaining either that the group is not protected at all, or that, even if protected, it has illegal aims and the defendant intends to further those aims.

In this case, consideration of the defendant's alleged failure to cooperate with the government in its investigation of illegal activities within the Black Hebrews is only proper if he has knowledge of those illegal activities. The defendant's association with Black Hebrews may be evidence of that knowledge, and may be considered for that limited purpose. We emphasize, however, that even this limited use of representations about the defendant's associations with a constitutionally protected group, in the absence of a reliable showing that he had the intent to further its illegal purposes, must withstand the heightened degree of scrutiny that we deem necessary to insure that the defendant is not penalized for mere association with members of a religious group.

We are not requiring courts confronted with information of this sort necessarily to explain their sentencing decision,[54] although

---

**53.** Brief for Appellant at 16–17. Although the first amendment does not require such a showing, the due process clause may. In this case, the government claimed that the defendant's crime was committed for the benefit of the Black Hebrews. Government Brief App. A at 26. Defendant denied this allegation. Presentence Report at 11. Under the reasoning of *Weston* and *Bass, see supra* at 933–935, due process would require either that the government's claim be disregarded or that it be supported by reliable evidence.

**54.** A statement of reasons for a sentencing decision is not generally required. *See, e.g., United States v. Bazzano,* 570 F.2d 1120, 1133 n. 21

an explanation of the considerations on which a sentence is based would serve many valuable functions,[55] especially in a case such as this in which sensitive constitutional rights are at issue. We simply point out that an unexplained sentencing decision may be particularly vulnerable to the close scrutiny that the first amendment and due process demand when the judge has been urged to consider information about the defendant's religious or political views or affiliations.

## IV. Application

The foregoing analysis of the relevant legal principles clarifies our task in reviewing the sentencing decision in this case. We must determine whether there was sufficiently reliable evidence that the defendant was a member of or closely affiliated with the Black Hebrews, that the Black Hebrews have certain illegal aims, and that the defendant intended to further those illegal aims. In addition, we will determine whether there was sufficiently reliable evidence that the defendant, whether or not he was a member, knew of illegal activities of the Black Hebrews so as to justify considering as an aggravating factor his failure to cooperate with the authorities in their investigation.

We cannot uphold the sentence on the basis of the record before us. When we examine the government's representations in light of the principles articulated in this opinion, we find little more than an attempt to establish guilt by association through an accumulation of uncorroborated suspicions. It does not appear from the record that the government can demonstrate a single direct link between the defendant and illegal activity by known members of the Black Hebrews.

The government claimed that the defendant's crime was committed for the benefit of the Black Hebrews.[56] The government verified the defendant's statement that he had spent the proceeds of the offense on clothes, stereo equipment and "tickets," [57] and then alleged that these purchases may have been for the benefit of the organization.[58] But the government provided no evidence whatsoever to substantiate this claim. Certainly, the purchases are of a type ordinarily intended for personal use, as the defendant claimed, and are not particularly useful in achieving maximum geographic mobility or repatriation to Israel. There thus appears to be no evidence whatsoever for the government's claim that the proceeds of the defendant's crime were to benefit the Black Hebrews.

The remaining evidence of the defendant's knowledge of or intent to further the illegal activities of the Black Hebrews concerns his alleged association with other Black Hebrews, some of whom have been involved in illegal activity. Yet this evidence consists of several thin strands, each of which is so frayed that, even together, they cannot support the conclusions that we have determined must accompany any unfavorable use of information concerning a defendant's affiliation with a protected organization.

On the one hand, the government claims that it can demonstrate direct association on one occasion between the defendant and two persons, Bruce Green and Bruce Stew-

(3d Cir.1977) (Adams, J., concurring), *cert. denied*, 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978); *United States v. Moore*, 540 F.2d 1088, 1091 (D.C.Cir.1976) (Separate Statements of MacKinnon, J., and McGowan, J.); *United States v. Donner*, 528 F.2d 276, 279 (7th Cir. 1975). However, in certain limited circumstances courts have required an explanation. *See, e.g., North Carolina v. Pearce*, 395 U.S. 711, 726, 89 S.Ct. 2072, 2081, 23 L.Ed.2d 656 (1969) (due process permits increased sentence on retrial after successful appeal only if court identifies specific conduct occurring after original sentencing proceeding); *United States v. Hansen*, 701 F.2d 1078, 1086 (2d Cir.1983).

**55.** For a comprehensive summary of the arguments in favor of requiring federal judges generally to state their reasons for a sentence, see *United States v. Bazzano*, 570 F.2d 1120, 1130–38 (3d Cir.1977) (Adams, J., concurring).

**56.** Government Brief App. A at 26.

**57.** Sentencing Transcript at 12–13.

**58.** Government Brief at 18 n. 17.

art, "identified through sources" as Black Hebrews. The government has provided no information about the identity or reliability of those sources or the basis for their assertion that these persons are members. Even if that information were provided, these individuals have only the most tenuous connection to illegal activity: Green was wanted for "a check charge at the time of the defendant's arrest," and Stewart is alleged to be the boyfriend of Warrena Bostick, who has been identified as a Black Hebrew, again by unnamed sources, and who is wanted for a burglary in which airline tickets were stolen.

The government also claims that it can show indirect association between the defendant and two other individuals, Beverly Caro and Myrtle Washington. Caro, in whose car the defendant was riding at the time of his arrest, "has been observed by [unnamed] members of law enforcement at a meeting house frequented by Black Hebrew members and at a convention of Black Hebrews," but has no apparent connection with any illegal activity. Washington, who allegedly had been "monitoring" proceedings against the defendant, is a convicted felon, but the government offers no basis for its assertion that she is a member of the group.

Finally, the government claims that the defendant is connected with two other members of the sect, Angela Kegler and Terry Warr, by their use of similar checks in a similar manner. While the government offers to produce quite persuasive evidence of their membership—Kegler was allegedly arrested at a Black Hebrew meeting dressed in "the garb of the sect" and Warr is allegedly a self-admitted member—the only connection between them and the defendant is the timing of the deposits of the checks.

The government does not offer proof of a single instance of direct association between the defendant and a person whose membership is reliably demonstrated, much less such a person who is also involved in or even suspected of illegal activity of the type

supposedly engaged in by members of the group. Even if the Black Hebrews were simply a criminal conspiracy with no first amendment status, and mere membership or affiliation were a proper consideration in sentencing, we would place this case at a point on the spectrum well short of the evidence in the *Fatico* case, and quite close to the *Weston* end of the spectrum. Certainly then the evidence is utterly inadequate to satisfy the additional requirement of the first amendment that there be reliable evidence of intent to further the illegal activities of the group, or, for the purpose of considering a failure to cooperate, at least specific knowledge of those activities. We doubt that the first amendment would permit an inference of specific intent to further the illegal activities of a group or even an inference of specific knowledge of illegal activities on the basis of one or two instances of association with members involved in those activities. But in the absence of a single direct link between the defendant and illegal activity by the Black Hebrews, consideration of the evidence of the defendant's affiliation with the Black Hebrews as an aggravating factor in sentencing was improper.

We therefore vacate the sentence and remand to the district court for resentencing. It is possible that in further proceedings the government can produce additional evidence of a sufficiently reliable caliber and quantity that the defendant was involved with the Black Hebrews with the specific intent to further the group's illegal activities, or at least that he knew of those activities and could thus be held responsible for his failure to respond to the prosecution's request for information. If not, the sentencing judge should clearly express in the record his intention to disregard the government's representations on this matter in imposing a sentence.

Apart from the requirements of due process and the first amendment on which we base this remand, Rule 32(c)(3)(D) of the newly amended Federal Rules of Criminal

Procedure [59] would presumably require the judge in further sentencing proceedings either to make findings as to any allegations contained in the presentence report whose accuracy is challenged by the defendant, or to expressly disregard those allegations. This new requirement should alleviate in most future cases the difficult task we have confronted in this case.[60]

We recognize that it is unusual for an appellate court to undertake such a detailed review of sentencing proceedings and to overturn the decision of the sentencing judge. But we are not aware of another case in which the government has urged a substantially increased sentence on the sole basis of the defendant's alleged membership in an organization protected by the first amendment, albeit one that is under investigation for substantial illegal activity. The first amendment demands extraordinary safeguards whenever the state would use against an individual his association with others on the basis of shared beliefs. This is particularly true when those beliefs place the group outside the mainstream of our society and beyond the sympathies and perhaps even the comprehension of the average citizen. Even when members of the association are engaged in illegal activities or seek illegal aims we must guard against any attempt to spread the taint of illegality throughout the association, for that is the beginning of persecution. Under the unusual circumstances of this case, we believe that our responsibility to ensure the constitutional integrity of the sentencing process requires an unusual degree of scrutiny.

The sentencing process in this case does not withstand that scrutiny.

McGOWAN, Senior Circuit Judge, concurring in the result:

I concur in the remand to the District Court because that will expose the issues in this case to the procedures established in the recently amended Fed.R.Crim.P. 32(c)(3)(D), which provides in pertinent part:

> If the comments of the defendant and his counsel or testimony or other information introduced by them alleged any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing.

The amended rule did not take effect until August 1, 1983, after the defendant's sentencing, and, thus, was not automatically applicable to this case. The Supreme Court's order promulgating the amended Rule provides, however, that the amendment may be applied "insofar as just and practical, in proceedings then pending." This is exactly the kind of case that prompted the amendment of the Rule, and its application on remand will provide an appellate court with a written record of findings and determinations made by the sentencing judge in passing sentence. This

---

**59.** The amended rule 32(c)(3)(D) provides as follows:

> If the comments of the defendant and his counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons or the Parole Commission.

The amended rule took effect on August 1, 1983, after the defendant's conviction and sentencing. But the Supreme Court's order provides that the amendments "shall govern all criminal proceeding thereafter commenced and, *insofar as just and practical*, in proceedings then pending." (Emphasis added.) We believe that compliance with Rule 32(c)(3)(D) would be both just and practical in further sentencing proceedings in this case.

**60.** Rule 32 does not, however, address the situation where a defendant does not contest the accuracy of information about his political and religious affiliations, but simply objects to the consideration of such information as improper.

will allow for limited review based on an actual record rather than appellate speculation.