STATE of Wisconsin, Plaintiff-Respondent,

v.

J.E.B., Defendant-Appellant.†

Court of Appeals

*No. 90-0963-CR. Submitted on briefs September 14, 1990.—Decided March 6, 1991.*

(Also reported in 469 N.W.2d 192.)

†Petition to review denied.

656

657

On behalf of the defendant-appellant, the cause was submitted on the briefs of *William J. Tyroler,* assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Donald J. Hanaway,* attorney general and *Thomas J. Balistreri,* assistant attorney general.

Before Nettesheim, P.J., Scott and Anderson, JJ.

NETTESHEIM, P.J.  J.E.B.[1] appeals from the sentencing provisions of two judgments of conviction for first-degree sexual assault and from an order denying his motion for resentencing. On appeal, J.E.B. contends his sentences are invalid because the trial court improperly considered his use of reading materials protected under the First Amendment to the United States Constitution. J.E.B. also argues his sentence is invalid because the

---

[1]We have masked the defendant's identity in order to shield the victim of this sensitive crime.

trial court engaged in "mechanistic" sentencing. We conclude that the trial court did not abuse its discretion by factoring J.E.B.'s reading habits into its sentencing decision. We further hold that apart from any first amendment considerations, J.E.B.'s sentence was based on relevant and sufficiently individualized factors.

## THE SENTENCING

The facts are not in dispute. On April 24, 1989, J.E.B. pled no contest to two counts of first-degree sexual assault contrary to sec. 940.225(1)(d), Stats. (1985–86).[2] The convictions resulted from J.E.B.'s illegal sexual contact with his juvenile daughter. The prosecution agreed to recommend sentences stayed in favor of probation on both counts. The presentence investigation report (PSI), on the other hand, called for a prison term. The trial court sentenced J.E.B. to thirty months' imprisonment on the first count and four years' imprisonment on the second count. The sentence on the latter count was stayed in favor of five years' probation to run consecutively with the sentence on the first count.

J.E.B.'s taste in reading material was a prominent feature of the PSI. The PSI author noted that J.E.B. had an interest in "pornography, especially the novels containing graphic descriptions of adults having sexual contact with children." Titles of and excerpts from some books J.E.B. owned and kept at his home appear in the PSI, but the books themselves were never made part of the record. Nor did the trial court inspect the books. J.E.B.'s wife is quoted in the PSI as observing that her

---

[2]Section 940.225(1)(d), Stats. (1985–86), was repealed effective July 1, 1989. Section 30, 1987 Wis. Act 332. J.E.B. was charged and convicted before the effective date of the repeal. A comparable statute now appears at sec. 948.02(1), Stats.

husband had consumed similar reading materials for years, that he kept the books under his bed, that he read the books in the bedroom, and that she believed he masturbated while reading the books. The PSI author concluded that the books J.E.B. read played a role in causing the "preverse [sic] adult sexual behavior he has engaged in with his daughter." Moreover, the PSI author concluded that J.E.B.'s choice of reading material "fueled" his "salacious interest in his daughter."

At the sentencing hearing, the trial court spoke to the information contained in the PSI. In particular, the court said that it "[c]ertainly d[idn't] like to read about the types of pornography that's kept at the house." Later in the proceedings, the court again referred to J.E.B.'s reading habits, stating: "[P]ornography goes to character. There is no alcohol or narcotics, but prevalent use of pornography here."

J.E.B.'s attorney moved for resentencing pursuant to Rule 809.30, Stats., arguing that the sentence was improperly based upon J.E.B.'s use of materials protected under the First Amendment to the United States Constitution. J.E.B. did not, and does not on appeal, assert a violation of rights guaranteed under the Wisconsin Constitution. Nor does J.E.B. argue that his sentence was in itself excessive or perverse. Rather, J.E.B. contends that the trial court's consideration of his constitutionally protected reading habits resulted in a harsher sentence than he otherwise would have received.

The trial court issued a written decision denying J.E.B.'s resentencing motion, explaining:

> The Court did refer to pornography at the sentencing hearing and stated further that the keeping of this material goes to character. Character is one of the factors that the Court uses when it hands down a sentence. Certainly the Court questioned the Defen-

dant's character when the Court learned of the many sexually explicit magazines the Defendant had in his possession on or about the dates of these incidents. But character is just one factor the Court examines. The other important factor the Court considered was the fact that these two counts involved first-degree sexual assaults . . .. It is this factor that weighed considerably in the Court sentencing the Defendant to thirty months in prison.

We make two initial observations before we address J.E.B.'s issues. First, the trial court's decision references magazines whereas the PSI indicates that J.E.B. possessed books. There is no indication on the record that the books contained pictures. Second, the text of the trial court's decision indicates that while J.E.B.'s choice of reading material was not the major factor influencing the sentence, it was nevertheless a relevant factor.

## STANDARD OF REVIEW

Ordinarily, sentencing is left to the discretion of the trial court and appellate review is limited to determining whether there was an abuse of that discretion. *State v. Roubik,* 137 Wis. 2d 301, 310, 404 N.W.2d 105, 108 (Ct. App. 1987). Our review is thus conducted in light of a strong public policy against interference with the trial court's sentencing decision. *Id.* In reviewing a sentence to determine whether discretion has been abused, we will begin with the presumption that the trial court acted reasonably, and the defendant must show some unreasonable or unjustifiable basis in the record for the sentence complained of. *Elias v. State,* 93 Wis. 2d 278, 281–82, 286 N.W.2d 559, 560 (1980). Unjustifiable bases for a sentence include irrelevant or improper considerations. *See id.* at 282, 286 N.W.2d at 561.

The trial court has great latitude in passing sentence. *State v. Jackson,* 110 Wis. 2d 548, 552, 329 N.W.2d 182, 185 (1983). Such discretion is not to be exercised, however, in the absence of reference to established considerations. Specifically, the trial court considers three primary factors: the gravity of the offense, the character of the offender and the need to protect the public. *Elias,* 93 Wis. 2d at 284, 286 N.W.2d at 561. The weight to be given each factor is a determination particularly within the wide discretion of the sentencing judge. *Anderson v. State,* 76 Wis. 2d 361, 364, 251 N.W.2d 768, 770 (1977). Other factors have been recognized as proper sentencing considerations, viz:

> A past record of criminal offenses; a history of undesirable behavior patterns; the defendant's personality, character and social traits; the results of a presentence investigation; the vicious or aggravated nature of the crime; the degree of the defendant's culpability; the defendant's demeanor at trial; the defendant's age, educational background and employment record; the defendant's remorse, repentance and cooperativeness; the defendant's need for close rehabilitative control . . . the rights of the public . . . [and] the length of pretrial detention.

*State v. Tew,* 54 Wis. 2d 361, 367–68, 195 N.W.2d 615, 619 (1972), *overruled on other grounds, Byrd v. State,* 65 Wis. 2d 415, 425, 222 N.W.2d 696, 702 (1974) (citations omitted). The Wisconsin Supreme Court has explained the policy concerns which require consideration of such factors in the sentencing decision:

> It is not the philosophy of modern criminal law that the punishment fit the crime alone and that for every violation of a particular statute there be an identical

sanction. In light of the function of the law to deter similar acts by the defendant and others and to rehabilitate the individual defendant, it is essential that a sentencing court consider the nature of the particular crime, *i.e.,* the degree of culpability—distinguishable from the bare-bones legal elements of it—and the personality of the criminal. The interests of both society and the individual must be weighed in each sentencing process.

*McCleary v. State,* 49 Wis. 2d 263, 271, 182 N.W.2d 512, 517 (1971). The United States Circuit Court of Appeals, Tenth Circuit, puts it more succinctly: "[T]he sentencing judge is entitled to all the help he [or she] can get." *United States v. Majors,* 490 F.2d 1321, 1322 (10th Cir. 1974), *cert. denied,* 420 U.S. 932 (1975).

Despite this need for all relevant information concerning an offender facing sentencing, the trial court's sentencing discretion is also subject to limitations. Under both federal and Wisconsin law, a sentence may not be based on constitutionally invalid grounds. *See, e.g., United States v. Bangert,* 645 F.2d 1297, 1307–09 (8th Cir.), *cert. denied,* 454 U.S. 860 (1981); *Hanneman v. State,* 50 Wis. 2d 689, 691, 184 N.W.2d 896, 897 (1971). *See also* Fed. R. Crim. P. 32.

## THE FIRST AMENDMENT

We begin our analysis with two important observations. First, the reading materials at issue in this case are constitutionally protected. The books were never made part of the record. The question of their obscenity has never been judicially determined under the *Roth-Miller* analysis. *See Roth v. United States,* 354 U.S. 476 (1957),

and *Miller v. California,* 413 U.S. 15 (1973).[3] As such, the state acknowledges that J.E.B.'s books are not obscene. The state also acknowledges that the materials do not constitute child pornography, for the material does not involve visual depiction of children engaged in sexual activity. *See generally* secs. 944.12 and 944.21, Stats. (1985–86); *Osborne v. Ohio,* 495 U.S. —, 110 S. Ct. 1691 (1990); *New York v. Ferber,* 458 U.S. 747 (1982); *State v. Bruckner,* 151 Wis. 2d 833, 447 N.W.2d 376 (Ct. App. 1989). Second, absent constitutional considerations, J.E.B.'s reading preference for this material was relevant to the sentencing given the nature of the convictions.

Thus we begin our analysis with the presumption that the materials are constitutionally protected and that the trial court and PSI used the term pornography not as a term of art, but rather as a generic expression indicating the sexually explicit nature of the books. As a result, the appellate question becomes whether the trial court's consideration of J.E.B.'s reading habits violated the first amendment and invalidates the sentence.

There is, surprisingly, little case law on the extent to which the first amendment limits the discretion of a

[3]The United States Supreme Court has developed a multifactor test to determine whether material is obscene. The test, commonly known as the *Roth-Miller* test, provides as follows: "The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller v. California,* 413 U.S. 15, 24 (1973) (citations omitted).

sentencing court.[4] What federal law exists on the question generally holds that a sentence based on activity or beliefs protected by the first amendment is constitutionally invalid. *See, e.g., United States v. Lemon,* 723 F.2d 922, 937 (D.C. Cir. 1983). However, if the first amendment activity carries some identifiable link to the criminal conduct, the activity is no longer protected. *Id.* at 936. The United States Supreme Court has not ruled directly on the question.[5]

[4]For this reason we certified this case to the Wisconsin Supreme Court. The supreme court, however, declined to take jurisdiction of this appeal.

[5]In *O'Brien v. United States,* 376 F.2d 538 (1st Cir. 1967), *vacated on other grounds,* 391 U.S. 367 (1968), the First Circuit Court of Appeals invalidated the amendment to the Selective Service statute under which O'Brien had been convicted for intentionally destroying his draft card. The invalidated provision directed that persons who destroyed draft cards in a manner which, in the court's view, bespoke opposition to American war efforts could receive stiffer punishment than persons who simply failed to retain their draft cards. The court of appeals upheld O'Brien's conviction, however, by construing a separate provision of the statute, which required registrants to possess their draft cards at all times, as a lesser included offense. The court of appeals then remanded the cause for resentencing, reasoning that it could not be sure that the district court did not "t[ake] into consideration what the statute, by virtue of the amendment, indicated be aggravating circumstances." *Id.* at 542. The "aggravating circumstances" referenced by the court were the destruction of draft cards by politically expressive means: "For the [district] court to . . . measure the sentence by the nature of [O'Brien's] communication, would be to punish defendant, pro tanto, for exactly what the First Amendment protects." *Id.*

The United States Supreme Court vacated the First Circuit Court of Appeals' ruling that the intentional-destruction-of-draft-cards-amendment to the statute was an unconstitutional restraint on

One Wisconsin appellate case has spoken to this issue. *See State v. Wickstrom,* 118 Wis. 2d 339, 348 N.W.2d 183 (Ct. App. 1984). However, the discussion in *Wickstrom* is decidedly limited.[6] As such, the case is more demonstrative than instructive.

This case pits important public policy and constitutional sentencing considerations against each other. On the one hand, public policy requires that a sentencing court obtain the fullest information possible so that a reasoned, intelligent and fair sentence may be fashioned. *See State v. McQuay,* 148 Wis. 2d 823, 827, 436 N.W.2d 905, 906–07 (Ct. App. 1989), *rev'd on other grounds,* 154 Wis. 2d 116, 452 N.W.2d 377 (1990). Indeed, the withholding of relevant sentencing information is against public policy. *Grant v. State,* 73 Wis. 2d 441, 448, 243 N.W.2d 186, 190 (1976). This requirement also implicates an offender's due process rights, assuring that a sentencing is based on legitimate considerations. *State v. Halbert,* 147 Wis. 2d 123, 127, 432 N.W.2d 633, 635 (Ct. App. 1988). On the other hand, a sentence may not be based on constitutionally invalid grounds. *See Bangert,* 645 F.2d at 1308–09.

J.E.B. places great reliance upon *Lemon* and its statement that "[a] sentence based to *any degree* on activity or beliefs protected by the first amendment is

free expression, and reinstated O'Brien's sentence. *See O'Brien v. United States,* 391 U.S. 367, 381–82 (1968). As a result, the Court did not address the assumption underlying the court of appeals' resentencing ruling, namely, that sentencing should not become a "back-door" censure of political belief.

[6]Related decisions—for example, those concerning consideration of a defendant's exercise of fifth or sixth amendment rights during sentencing—are instructive, but not directly on point. *See, e.g., Scales v. State,* 64 Wis. 2d 485, 219 N.W.2d 286 (1974).

constitutionally invalid." *Lemon,* 723 F.2d at 938 (emphasis added). However, under closer scrutiny, the ultimate holding in *Lemon* proves not to be as absolute as the above language suggests.

We examine *Lemon* in some detail. Lemon was charged with two counts of interstate transportation of a stolen security contrary to 18 U.S.C. sec. 2314. While awaiting trial, Lemon moved the district court to release him on bond. In a written response to Lemon's motion, the prosecution alleged that Lemon was a member of a group known as the "Black Hebrews," and that members of the Black Hebrews had a history of criminality and "fugitivity." During a hearing on Lemon's motion, the prosecution described the Black Hebrews as a religious sect whose members were descendents from one of the original tribes of Israel. *Lemon,* 723 F.2d at 924. For this part, Lemon denied membership in the group, and objected to the prosecution's actions as an attempt to establish "guilt by association." *Id.* The district court denied Lemon's motion for release.

Plea negotiations ensued and Lemon pled guilty to one of the two counts with which he was charged. By so doing, Lemon admitted that he knowingly deposited a forged check in his bank account. In its sentencing memorandum and again at the sentencing hearing, the government renewed its allegations that Lemon was a member of the Black Hebrews and that group members had an extensive history of criminality.

Even though it was Lemon's first offense, the government's sentencing position was that Lemon should be "given a substantial sentence because it would deter him and others involved in the [Black Hebrews] from such illegal activity, and because [he] had failed to respond to the prosecution's request that he cooperate in its investigation of illegal activity among the Black Hebrews." *Id.*

667

at 925. In particular, the prosecutor argued that Lemon's alleged membership in the Black Hebrews was relevant because his crime was "part of a larger pattern of economic crimes committed by Black Hebrews to fund their 'repatriation' to Israel." *Id.* at 926.

The sentencing hearing focused primarily upon the reliability of the government's representations concerning Lemon's involvement with the Black Hebrews. Lemon acknowledged knowing members of the Black Hebrews, but flatly denied that he was then or ever had been a member of the group. He stated that he had no knowledge of illegal activity by the Black Hebrews and that he therefore could not assist prosecutors in their investigation of the group. Lemon requested that the court refuse to consider any allegation that he belonged to or acted in furtherance of illegal activities undertaken by the Black Hebrews. The court denied the motion and proceeded, without comment or explanation, to sentence Lemon to four years' imprisonment. *Id.* at 929. The sentence was within the statutory maximum, but by the government's own concession, was "an unusually severe sentence for a first offender." *Id.*

The court of appeals vacated the sentence and remanded the cause for resentencing, ruling that the sentencing judge appeared to have relied on information about Lemon's alleged associations with the Black Hebrews. *Id.* at 930. More particularly, the court ruled that the district court's reliance upon Lemon's associations was constitutionally impermissible because the government had not *reliably shown* that the Black Hebrews had illegal aims and that Lemon intended to further such illegal aims. *See id.* at 936–37 and 939–42. "Due process in this context [sentencing]," observed the court, "requires some *identifiable link* between the

defendant and illegality among the Black Hebrews." *Id.* at 936 (emphasis added).

Thus, the *Lemon* court's grand opening statement that "[a] sentence based to any degree on activity or beliefs protected by the first amendment is constitutionally invalid" proves not as absolute as it suggests. Sufficient linkage between the claimed protected activity and the criminal conduct may well render the activity unprotected. The reversal in *Lemon* was occasioned by the government's failure to link Lemon's first amendment activity (association and belief) to the wrongful conduct. Instead, the government supplied only "an accumulation of uncorroborated suspicions." *Id.* at 941.

Both J.E.B. and the state tailor their arguments along the lines of the *Lemon* holding. The state argues that "[h]ere, we are not concerned with a man who was simply reading a book about sexual acts with children, but with a man who was translating what he had read into sexual acts with his child."

The state grounds its position, in part, on a conclusion from a report by the United States Attorney General's Commission on Pornography to the effect that "[a]vailable evidence now suggests that substantial exposure to sexually degrading material . . . increases the likelihood . . . that the viewer will engage in acts of sexual violence, coercion or unwanted aggression." The state also suggests we may so conclude because of the information provided by J.E.B.'s wife relating that J.E.B. had possessed such books for "as long as [she] could remember" and that she thought he masturbated while reading. "[I]f the books describing sexual activity with children prompted J.E.B. to engage in sexual acts with himself," the state contends, "it can reasonably be inferred . . . that they prompted him to engage in sexual acts with his children."

669

J.E.B. counters that the state is, in effect, asking us to take judicial notice of conjecture. He maintains that his reading habits are as equally distanced from his criminal conduct as Lemon's association and beliefs were from his transporting of stolen securities. In short, J.E.B. contends that his choice of reading material is not sufficiently related to his criminal conduct so as to render the former constitutionally germane to the latter.

A sentencing, however, is not a trial with an attendant burden of proof. A sentencing judge is not confined to the narrow issue of guilt. *Williams v. New York*, 337 U.S. 241, 247 (1949). Rather, the judge's task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. *Id.*

We are not required to determine in this case whether J.E.B.'s reading of sexually explicit books actually caused him to assault his daughter. Nor did the trial court make any such determination. This is an unresolved matter which remains open to debate between experts far more informed than we or the trial court on this question. Nor does reliance upon the attorney general's report for such a proposition resolve the debate or control the question. It represents but one more voice in the ongoing debate.

Rather, the question is whether the trial court's consideration of this admittedly relevant factor ran afoul of the first amendment. The *Lemon* court stated that Lemon's associations, although protected on a threshold basis, could be used "for the narrow purpose of determining whether he had knowledge of the illegal activities of the group and could therefore be held responsible for his failure to cooperate with the government in its investigation of those illegal activities." *Lemon*, 723 F.2d at 937.

The *Lemon* court concluded that a "reliable showing" of Lemon's intent to further the Black Hebrews' illegal purposes was necessary before such became a legitimate sentencing consideration. *Id.* at 940. The court vacated Lemon's sentence, remanded for resentencing and speculated that the government might be able to establish such linkage at the resentencing. *Id.* at 942.

We now turn to *Wickstrom*, the lone Wisconsin case on this subject. There the court of appeals ruled, *inter alia*, that the defendant's sentence was not invalid because the trial court had commented upon Wickstrom's beliefs during sentencing. *See Wickstrom*, 118 Wis. 2d at 356–57, 348 N.W.2d at 192.

Wickstrom was convicted of two counts of falsely assuming to act as a public officer or employee contrary to sec. 946.69(1), Stats. After being defeated in an election for chairman of the Town of Fairbanks in Shawano county, Wickstrom had a local newspaper print a public notice declaring the creation of "Constitution Township of Tigerton Dells" and a meeting to elect township officers. The organizational meeting was held; Wickstrom participated and was elected town clerk and municipal judge of his fictitious governmental unit.

Acting upon this contrived authority, Wickstrom proceeded, in essence, to impersonate a township by issuing various licenses, filing documents and carrying on "official" correspondence. During pretrial hearings, Wickstrom told the trial court that he intended to set up more townships in other states. Wickstrom also had his attorney serve a "subpoena" for a "Citizens Grand Jury" on the trial court. Wickstrom signed this "subpoena" himself, using the title "Judge."

At the sentencing hearing, the trial court stated that Wickstrom held "insidious beliefs" and was "dangerous because he expresses a position which is contrary to our

form of government." *Wickstrom,* 118 Wis. 2d at 356, 348 N.W.2d at 192. On appeal, Wickstrom complained that he had been sentenced for expressing his beliefs. The court of appeals disagreed, concluding that "the [trial court's] references to Wickstrom's beliefs and position were intended to refer to Wickstrom's belief that he could exercise authority reserved to those upon whom the state, through its political subdivisions, confers authority." *Id.* at 357, 348 N.W.2d at 192. In holding that the trial court acted reasonably, the court of appeals did not elaborate, save to state that a belief that one is above the law is insidious and bears directly upon the offender's potential for rehabilitation. *See id.*

Although this was the extent of the court of appeals' analysis, it is clear that the court saw sufficient linkage between Wickstrom's constitutional activity and his criminal conduct so as to permit consideration of Wickstrom's beliefs in the sentencing. Although not citing any constitutional authority, the court, in essence, performed a *Lemon* analysis, satisfying itself of sufficient linkage or relationship between the protected activity and the criminal conduct or goal. *See Lemon,* 723 F.2d at 936. Wickstrom's exercise of a right protected under the first amendment—his expressed belief that he would set up townships in other states—paralleled the conduct for which he was sentenced—setting up and carrying on the business of a fictitious government official. This, the court observed, traveled to the possibility of Wickstrom's rehabilitation, *Wickstrom,* 118 Wis. 2d at 357, 348 N.W.2d at 192, a matter bearing upon Wickstrom's character.[7]

---

[7]The court of appeals also concluded that Wickstrom's constitutional activity related to the danger he would pose to the public if he believed he could violate its laws with impunity. *State*

We deem the *Lemon* approach sensible and workable. We expressly adopt it here.

Although not described in detail in the record, J.E.B.'s books dealt with graphic descriptions of adults having sexual contact with children. J.E.B.'s criminal conduct mirrored this very activity. This congruity of J.E.B.'s reading preferences with his criminal conduct certainly is not the "accumulation of uncorroborated suspicion" which *Lemon* condemns. While not established to be "cause and effect," we must remember that such is not the test. Rather the test is whether there is a reliable showing of a sufficient relationship between the two. Where, as here, the criminal conduct so parallels the constitutional activity, we conclude that such a showing has been made. The trial court's consideration of J.E.B.'s reading materials did not violate J.E.B.'s first amendment rights.

## MECHANISTIC SENTENCE

J.E.B. attacks the sentence in an additional respect. He argues the trial court abused its discretion because it applied the "gravity of the offense" sentencing factor, *see Elias,* 93 Wis. 2d at 284, 286 N.W.2d at 561, in a "mechanistic" manner. Specifically, J.E.B. contends that the court paid only "lip service" to other sentencing factors, allowing the gravity of the offense and the need for "dispositional consistency" to control the sentence meted out.

---

*v. Wickstrom,* 118 Wis. 2d 339, 357, 348 N.W.2d 183, 192 (Ct. App. 1984).

It is improper for a court to approach sentencing decisions with an inflexibility that bespeaks a made-up mind. *Halbert,* 147 Wis. 2d at 128, 432 N.W.2d at 635. For instance, in *State v. Martin,* 100 Wis. 2d 326, 327, 302 N.W.2d 58, 59 (Ct. App. 1981), the court of appeals overturned a sentence where the trial court's sentence reflected a uniform policy of refusing to consider probation in drug delivery cases.

J.E.B. points to the sentencing court's remarks concerning the seriousness of the offense at the Class B felony level as bespeaking the sentencing court's "made-up mind." J.E.B.'s approach, however, is too narrow. We suspect that nearly every sentencing will contain remarks to provide fuel for such an argument. After all, at some point, the sentencing court must make up its mind, select a sentencing option over others, and say why.

Rather, we properly view the sentencing remarks in their totality. Here the sentencing court spoke to both the positive and negative aspects of J.E.B.'s condition. As to the former, the court noted J.E.B.'s military service, church affiliation, employment record and lack of prior criminal record. As to the latter, the court noted the family "disorganization," J.E.B.'s abusive treatment of his wife, that the offenses were not isolated, and, as we have already discussed, J.E.B.'s reading of sexually explicit materials.

In addition, the sentencing court noted the state's sentencing recommendation as compared with other cases, the seriousness of the offense as indicated by the Class B felony designation, and an awareness of consistency considerations. Most important, at least with respect to J.E.B.'s complaint of a mechanistic sentence, the sentencing court acknowledged its obligation to indi-

vidualize the sentence. "I realize—at the same time realizing every case is different and every case should be dealt with on its own basis."

While the sentencing court noted in its postconviction decision that the seriousness of the offense "weighed considerably" in its sentencing decision, we must bear in mind that the weight to be given to each sentencing factor is a determination particularly within the wide discretion of the sentencing judge. *Anderson,* 76 Wis. 2d at 364, 251 N.W.2d at 770.

We do not read the sentencing court's remarks, viewed in their totality, as merely paying "lip service" to the various sentencing criteria it considered. The court touched on all the factors—positive and negative—which were relevant to J.E.B.'s sentencing. This process hardly bespeaks a mind already made-up. The court then made its decision, explained why, and in so doing expressly recognized its duty to individualize the sentence. No abuse of discretion occurred.

*By the Court.*—Judgments and order affirmed.